**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

LAMONE LAUDERDALE                                        PLAINTIFF

v.                                        CIVIL ACTION NO. 4:23-cv-00079-JHM

JASON WOOSLEY, *et al.*                                        DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the renewed motion for summary judgment filed by Defendants Grayson County, Bryan Henderson,[1] Bobby Oldham, Jack Pinkert, David Gary, Sara Board, Janice Carago, Gary Skaggs, Roy Washington, and Outis Meredith. (DN 90). Plaintiff Lamone Lauderdale filed a response to the motion (DN 100), and Defendants have filed a reply (DN 104). For the reasons that follow, Defendants' motion for summary judgment will be granted.

**I. BACKGROUND**

Plaintiff filed this *pro se* 28 U.S.C. § 1983 action against Defendants alleging multiple violations of his First and Fourteenth Amendment rights and state law negligence claims arising out of his pretrial detention at the Grayson County Detention Center (GCDC). (DNs 1, 13, 23-1). The Court presumes familiarity with the extensive procedural history of this case and recites only the portions that are instructive to the present motion.

Pursuant to 28 U.S.C. § 1915A, the Court screened Plaintiff's complaint and amended complaints and permitted the following to proceed for further development: (1) Fourteenth Amendment conditions of confinement claim against Grayson County for allegedly holding Plaintiff in a cell for 24 hours per day and only allowing him one hour of outside

---

[1] Defendants refer to Defendant Henderson as "Bryan Henderson," "Kim Henderson" and "Gary Henderson" throughout their briefing in connection with the instant motion. The correct name of this defendant is Bryan Henderson, and "Defendant Henderson" shall refer to Bryan Henderson herein.

recreation/exercise per week; (2) Fourteenth Amendment deliberate indifference to serious medical needs claim against Grayson County and Defendant-Nurses Carago, Skaggs, and Washington alleging inadequate mental health and medical treatment; (3) Fourteenth Amendment deliberate indifference to  safety (failure to protect) claim against Defendant-Captains Oldham and Pinkert based upon an alleged assault of Plaintiff by other inmates when he was placed in a general population cell; (4) Fourteenth Amendment procedural due process claim against Grayson County, Chief Deputy Henderson, Colonel Gary, Captain Pinkert, and Captain Oldham, related to an alleged disciplinary action they took against Plaintiff; (5) First Amendment free exercise and Religious Land Use and Institutionalized Persons Act  (RLUIPA) claims against Grayson County and Kitchen Supervisor Meredith alleging the denial of a religious diet; (6) First Amendment free speech claim against Grayson County and Deputy Board alleging restrictions to publications; (7) First Amendment free association claim against Grayson County pertaining to GCDC's visitation policy; (8) state law negligence claims against Carago, Skaggs, and Washington (in relation to Plaintiff's deliberate medical indifference claims against them), and against Oldham and Pinkert (in relation to Plaintiff's deliberate indifference to safety claim against them). (DNs 18, 32).

Following the close of discovery, Defendants filed an initial motion for summary judgment which was denied without prejudice.  (DNs 74, 88).  This renewed motion for summary judgment followed.  (DN 90).

**A.**

In their motion, Defendants assert that all of Plaintiff's claims fail as a matter of law and that they are entitled to qualified immunity.  (DN 90-1, Page ID.1696-1717).  In support thereof, they submit the sworn affidavits of GCDC Jailer Jason Woosley, Captain Bobby Oldham, and

2

Nurse Gary Skaggs; the GCDC Inmate Recreation and Administrative Segregation Policies and Procedures; Plaintiff's Medical Questionnaire and progress notes; GCDC Isolation/Suicide Watch Logs; Inmate Activity Tracking List; inmate grievance dated June 1, 2023; and a Notice of Administrative Charges and Disciplinary Hearing Results.  (DN 90-2 to 90-13).

**B.**

Plaintiff has responded to Defendants' motion for summary judgment.  (DN 100).  Thereto, he attaches a declaration under penalty of perjury and memorandum of law.  (DN 100-1, PageID.2253 to 100-2, PageID.2324).  Plaintiff incorporates by reference the exhibits submitted in connection with his response to Defendants' previous motion for summary judgment, which include: various GCDC policies and procedures; Medical Questionnaire, progress notes, health assessment, and private medical records; Federal Inmate Doctor Request and Co-pay forms; Resident Requisition forms; numerous grievances; Incident Report dated June 5, 2023; Activity Tracking List; Inmate Housing History; Notice of Administrative Charges and Disciplinary Hearing Results; and a Legal Material Copy Acknowledgement.  (DN 79-1, PageID.898 to 79-4, PageID.1151).

**C.**

In their reply, Defendants contend that Plaintiff has not submitted evidence beyond his own self-serving allegations to establish a violation of his constitutional rights.  Moreover, they state that Plaintiff has advanced new factual allegations in his response while failing to respond to several of Defendants' arguments, including their assertion of qualified immunity.  (DN 104, PageID.2332-2346).

## II.  LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).  The non-moving party's evidence is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the party opposing summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56.  "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage."  *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status

4

as a *pro se* litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010).

### III.  DISCUSSION

### A.

Plaintiff was booked into GCDC on December 15, 2022.  On that date he completed a Medical Questionnaire on which he listed ''vertibre broke in neck, neck and shoulder issues" as "other medical problems."  (DN 90-6).  Plaintiff reported he was taking Keppra twice daily for epilepsy and had been prescribed Effexor for emotional problems.  (*Id.*)

Progress notes from an intake evaluation with Skaggs document that Plaintiff reported a "past [suicide] attempt 4/2020 by hanging – states only attempt.  Never was treated or seen by a psych Dr."  (*Id.*).  Plaintiff reported no mental health diagnosis or medications, but then stated he was diagnosed with "bipolar depression schizophrenia a long time ago."  (*Id.*).  Skaggs attests that he then went through the protocol of placing Plaintiff on suicide watch "for his own safety and the safety of other inmates and staff."  (DN 90-5).

Plaintiff was placed on suicide watch on December 15, 2022.  (DN 90-10).  Logs submitted by Defendants indicate that Plaintiff was under both "high" and "moderate" suicide watch at various times, indicating 10-minute and 15-minute routine checks, respectively.  The logs document Plaintiff's location or activity within the cell accompanied by the date and time and employee initials.  (DN 90-7).

Jailer Woosley attests that GCDC offers a mental health crisis intervention hotline available to all inmates through "Communicare."  Plaintiff did not utilize this service.  (DN 90-2).

Woosley further attests that Plaintiff is a federal inmate, and as such, "[a]ll requests for medical treatment outside of the facility in which federal inmates are incarcerated must go through

and be approved by the United States Marshals." (DN 90-2).  According to Woosley, GCDC never received approval for Plaintiff's medical treatment outside of the facility.  (*Id.*).  However, in response to a medical grievance, a GCDC official presumed to be Woosley advised Plaintiff, "[i]n order to get treatment or be referred elsewhere you have to see our medical authority.  Any outside treatment has to be ordered by him and approved by the USMS."  (DN 79-1, PageID.951).

The GCDC Inmate Recreation Policy permits all inmates to "participate in an average of one (1) hour of physical exercise per day with at least three (3) exercise periods per week outside the cell."  (DN 90-3).  The Administrative Segregation Policy provides that "[i]nmates placed in administrative segregation shall receive all privileges granted to inmates in the general population," with the exception that certain "activities which may constitute a threat to the inmate's own safety or the safety of the others, may be withheld."  (DN 90-4).  Woosley attests that "GCDC provided weekly outside exercise time to Plaintiff while in administrative segregation." (DN 90-2).

On June 1, 2023, Plaintiff was moved to Cell 161 in general population.  According to Plaintiff, this unit held "known inmates that were aggressor, rule violators, and safety and security threats."  (DN 23-1, PageID.490).  The Inmate Activity Tracking List shows the notation "moved to 161 from seg due to needing cell."  (DN 90-10).  Woosley attests that Cell 161 "is a small cell that contains less inmates than other general population cells and the inmates housed in Cell 161 are non-violent.  GCDC needed Plaintiff's administrative segregation cell for a more problematic inmate and thus moved Plaintiff to the next available, non-violent cell in the system." (DN 90-2).  Oldham attests that he followed GCDC policy and procedure to move Plaintiff into a "'max' general population cell, which are small cells that house non-violent inmates and are thus the next safest option [to segregation]."  (DN 90-9).

6

On June 1, 2023, Plaintiff filed a grievance regarding his transfer to Cell 161, stating "I do not feel safe in this unit . . . . I was forced to be moved into a unit around other inmates I do not feel safe around." He stated that there are "no cameras," the cell door did not lock, and the units were not properly monitored. "I fear being forced to sleep in a cell with someone that will harm me." (DN 72-9, PageID.1001). A responding deputy wrote:

> You will not be going back to Ad Seg. We put you in a max unit [be]cause its small and can only have 8 people in it. This is where you will stay until you can tell us exactly why you are scared & who of[;] stating gangs is not a reason.

(*Id.*) (cleaned up). Plaintiff did not submit another grievance to provide more specific information. (DN 90-2). Woosley states, "GCDC is a county jail with limited space to move inmates at every request. There must a rational reason or legitimate, verifiable threat." (*Id.*). Plaintiff alleges, however, that Pinkert knew that "the inmates in that unit threatened the Plaintiff with bodily harm[.]" (DN 23-1, PageID.491).

The Inmate Activity Tracking List reveals that Plaintiff was moved to an isolation cell the following day, June 2, 2023, with the notation "SAFETY AND SECURITY." (DN 90-10). Oldham attests that he temporarily moved Plaintiff to investigate his safety concerns. (DN 90-9). Following his investigation, he "confirmed there was not an active threat to Plaintiff's safety in Cell 161 and moved Plaintiff back into Cell 161 on June 3, 2023." (*Id.*).

On June 2, 2023, a "Notice of Administrative Charges" was issued by Pinkert charging Plaintiff with using profanity, derogatory remarks, or gestures to staff, visitors, or inmates; disrupting religious, medical, food services, or a facility program; and interfering with the security operations of the facility. (DN 90-12). The notation "refused to sign" and the date of June 3, 2023, appear on this document. (*Id.*). On June 6, 2023, Oldham and Henderson, as members of the GCDC Disciplinary Board, found Plaintiff guilty of the charges and sentenced him to 97 days in

isolation with review after 45 days.  Plaintiff did not indicate whether he wanted to appeal this determination and only a hand-drawn line appears in the form's signature area.  (DN 90-13).  Plaintiff's grievances related to this issue assert that the charges stemmed from a "clear misunderstanding with Nurse Christina."  (DN 79-2, PageID.1036).

GCDC's Inmate Due Process Policy and Procedure provides that, for "major or serious violations," a deputy will prepare an Incident Report stating fully and accurately all facts pertaining to the rule(s) violated.  (*Id.*, PageID.1021-22).  The Jailer will then provide written notification to the inmate of the charges on the appropriate form, inform the inmate of the right to request a disciplinary hearing, and outline the timeframe in which said hearing might take place.  (*Id.*, PageID.1022).  The Jailer determines whether a hearing is warranted if one is requested.  (*Id.*, PageID.1023).

An Incident Report dated June 5, 2023, indicates that "Inmate Lauderdale . . . in Green Pod Max Cell 161 assaulted by inmates."  (*Id.*, PageID.1017-18).  Plaintiff appeared to have a "busted lip" and told deputies that the other inmates "stole his food, commissary," and another told Plaintiff that he was "going to poke him."  (*Id.*).  Plaintiff submitted a grievance on June 5, 2023, stating that he was "jumped by 3 inmates," suffered various injuries, and had his property stolen, which he believed "could have and should have been prevented."  (DN 79-2, PageID.1002).  The response reads, "[y]our concerns were looked into and you would not give information of why or whom was threatening you or making you feel unsafe.  Your safety and security was addressed with a max cell."  (*Id.*).

The GCDC Food Service Policy with respect to Religious Diets provides, "[s]pecial diets shall be provided where reasonably possible when [an] inmate's religious beliefs require adherence

8

to dietary laws. Provisions shall be made for such special diets as approved after consultation with the religious authority." (DN 79-3, PageID.1080).

Plaintiff identifies as Muslim and requested a kosher diet during his booking into GCDC. (DN 79-1, PageID.17-19; DN 100-1, PageID.2253-54). He filed multiple grievances and requisition forms between January 12, and January 23, 2023, stating that he had not received his kosher diet since December 15, 2022. Specifically, he indicated that Meredith, the jail's kitchen supervisor, would not provide Plaintiff a list or otherwise identify kosher-compliant items in the jail's commissary, which led to Plaintiff ordering non-kosher items by mistake and resulting in the cancellation of his religious diet plan. (DN 79-3, PageID.1087-88).

GCDC's Property Policy permits two paperback books as personal property of the inmates. (*Id*., PageID.1041-42). Property is accepted within the first fourteen days of a detainee's confinement at GCDC. (*Id*., PageID.978). As to these restrictions, Woosley attests:

> Allowing inmates unfettered access to publications would make the facility less safe by increasing the workload of deputy jailers and providing material that would be used to create fires, clog plumbing, or conceal contraband. Requiring deputy jailers to check every publication for contraband, sort it, deliver it, and dispose of it would detract from their ability to perform normal duties maintaining safety and security of the facility.

(DN 90-2).

As to visitation, the Inmate Rules and Handbook provides that "[i]nmates are allowed at least one visit per week . . . . Each visit will be a minimum of fifteen (15) minutes." (DN 79-2, PageID.981).

### B.

### 1. Fourteenth Amendment—Conditions of Confinement

The "Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees" and consists of two components or prongs. *Bensfield v. Murray*, No. 4:21-CV-

9

P104-JHM, 2022 WL 508902, at \*2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)).  First, Plaintiff must show "that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Contemporary standards of decency determine whether conditions of confinement meet this standard.  *See, e.g., Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  Contemporary standards of decency are violated only by "extreme deprivations" which deprive the prisoner of the "minimal civilized measure of life's necessities." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9, (1992)).[2]

Second, Plaintiff must show that Defendant acted "deliberately" and "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).  Stated another way, "[a] pretrial detainee must prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'"  *Id.* at 596–97 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)).

Where, as here, a claim is asserted against a municipality or a county, Plaintiff must also show that his injury was caused by an unconstitutional "policy" or "custom" of Grayson County. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.*; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  To demonstrate municipal liability, a plaintiff "must (1) identify the

---

[2] The first, or objective prong of a conditions of confinement claim is the same under both the Eighth and Fourteenth Amendments.  *See, e.g., Batton v. Sandusky Cnty.*, No. 23-3168, 2024 WL 1480522, at \*3 (6th Cir. Apr. 5, 2024) (noting that the elements of a deliberate indifference claim for a pretrial detainee mirror the elements for a convicted prisoner with an objective and subjective component, but the subjective component is modified).  The Court will therefore cite to cases applying the Eighth Amendment standard where relevant to the objective prong.

10

municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

"An underlying constitutional violation is the *sine qua non* of municipal liability . . . ." *Puskas v. Delaware Cnty.*, 56 F.4th 1088, 1099 (6th Cir. 2023); *see also Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017) ("No constitutional violation means no municipal liability."), *abrogated on other grounds as recognized in Romero v. City of Lansing, Mich.*, 159 F.4th 1002, 1009 (6th Cir. 2025); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 389 (6th Cir. 2018) ("There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails.").

Plaintiff's second amended complaint alleged that while he was in administrative segregation, he was confined to a cell 24 hours per day and "only allowed one (1) hour of outside recreation a week. Due to the winter weather, he has been denied outside recreation all together." (DN 23-1, PageID.498). Liberally construing Plaintiff's allegations, the Court permitted a Fourteenth Amendment conditions of confinement claim to proceed against Grayson County for allegedly holding Plaintiff in a cell for 24 hours per day and only allowing him one hour of exercise/recreation each week. (DN 32, PageID.554).

Plaintiff now, in his declaration opposing summary judgment, seeks to expand the scope of his claim by asserting that he "was denied adequate exercise and recreation," and that he received out-of-cell exercise/recreation periods only ten to 15 times in 52 weeks. (DN 100-1, PageID.2256; DN 100-2, PageID.2269-70). Insofar as Plaintiff has asserted new facts in his opposition to summary judgment, the Court cannot consider these. *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019), *cert. denied*, ⸺ U.S. ⸺, 141 S. Ct. 162

11

(2020) (plaintiff was precluded from raising new claim at summary judgment where she failed to raise claim in complaint and failed to adequately request leave to amend); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("It is also the case that, by raising the claims for the first time in his opposition to summary judgment, Desparois did not properly present these claims before the district court. As the district court rightly pointed out, a plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."). This is particularly true in light of the protracted litigation of this case, during which Plaintiff amended his complaint twice. *See Stoutamire v. Schmalz*, No. 1:16CV2840, 2022 WL 263021, at *6 (N.D. Ohio Jan. 28, 2022) ("[Plaintiff] has sought leave to amend twice in this case so undeniably he is familiar with the procedural mechanism for adding claims or factual allegations. Yet, he never sought leave to amend to add these additional allegations against [Defendant] and therefore, he cannot now for the first time allege these allegations as a means to defeat [the] summary judgment motion.").

As to Plaintiff's original claim challenging the jail's policy of one hour of outside exercise/recreation per week, Defendants argue that it fails as a matter of law because the Sixth Circuit has not prescribed a minimum standard for inmate recreation periods outside of their cell and that Plaintiff was not prohibited from exercising entirely, as he could do so in his cell. Additionally, they argue that he fails to connect the alleged Fourteenth Amendment violation to a policy or custom of Grayson County for purposes of municipal liability. (DN 90-1, PageID.1697-1700).

"It is generally recognized that a total or near-total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees. Inmates

12

require regular exercise to maintain reasonably good physical and psychological health." *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983) (issue of fact existed as to whether defendants denied, without penological justification, of out-of-cell exercise during inmate's 46-day tenure at state prison). "The Sixth Circuit, applying Supreme Court precedent, has recognized that outdoor recreation, in some undefined form and amount, is necessary for inmates' well-being[,]" but has "expressly refrained from prescribing any minimum standard, below which a per se violation of the Eighth Amendment would be made out." *Jones v. Stine*, 843 F. Supp. 1186, 1193 (W.D. Mich. 1994). The "deprivation of nearly all fresh air and light might be an Eighth Amendment violation." *Id.*

Defendants correctly argue that "[t]here is no controlling precedent requiring a minimum amount of or space for outdoor recreation for pretrial detainees . . . ." *Hall v. Cuyahoga Cnty.*, No. 1:23-CV-01710-PAB, 2024 WL 3091069, at *13 (N.D. Ohio June 21, 2024) (pretrial detainee failed to state a claim of unconstitutional conditions of confinement where he did "not allege that he was denied the ability to exercise in his cell or in any other place in the Jail."). (DN 91-1, PageID.1697). Additionally, Plaintiff cites to no authority holding that the jail's custom of limiting administrative segregation inmates to one hour per week, as opposed to its general recreation policy permitting three out-of-cell exercise periods per week, is unconstitutional. *See Wilson v. Bouchard*, No. 2:21-CV-12066, 2022 WL 14812654, at *5 (E.D. Mich. Sept. 27, 2022), *report and recommendation adopted*, No. 21-12066, 2022 WL 14789150 (E.D. Mich. Oct. 25, 2022) (rejecting Plaintiff's contention that he was entitled to more recreation time than jail's policy of "at least one (1) hour, once per week; provided that security, housing and staffing constraints permit" and finding "no caselaw to suggest that this policy is unconstitutional."); *Pointer v. McArthur*, No. 1:14-CV-2012, 2015 WL 1245972, at *3 (N.D. Ohio Mar. 18, 2015) (plaintiff in

13

high security unit failed to state a plausible claim that he was entitled to more recreation than policy provided because "[r]ecreation offered once a week does not constitute total or near-total deprivation of exercise."); *cf. Campbell v. Butler Cnty. Jail*, No. 1:23-CV-763, 2025 WL 2602597, at \*2 (S.D. Ohio Sept. 9, 2025), *report and recommendation adopted*, 2025 WL 2799477 (S.D. Ohio Oct. 1, 2025) (complaint alleging jail policy or practice depriving detainee of outdoor recreation for over 50 months resulting in health conditions stated a plausible Fourteenth Amendment claim). Accordingly, Plaintiff's Fourteenth Amendment claim asserting that the GCDC had a custom or practice of imposing unconstitutional conditions based upon limited outside recreation time fails as a matter of law. Defendants are entitled to summary judgment on this claim.

### 2. Fourteenth Amendment—Deliberate Indifference to Serious Medical Needs

"Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. An officer violates that right if that officer shows deliberate indifference to [a pretrial detainee's] serious medical needs[.]" *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (internal citations and quotation marks omitted); *Gist v. Trinity Servs. Grp.*, No. 3:22-CV-P270-CHB, 2023 WL 2531735, at \*4 (W.D. Ky. Mar. 15, 2023). A pretrial detainee must satisfy two elements for a claim based on deliberate indifference to a medical need under the Fourteenth Amendment: (1) he "had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawne*r, 14 F.4th at 596) (internal quotation marks omitted)).

14

*a. Mental health conditions*

Plaintiff claims that he has the serious medical needs of depression, posttraumatic stress disorder (PTSD), anxiety, schizophrenia, and seizure disorder, and despite being placed on suicide watch upon booking, he did not receive mental health treatment. (DN 100-2, PageID.2276-77). Additionally, he argues that "the record is devoid of any evidence that the Defendants informed Plaintiff of any triage or mental health protocols, and/or procedures." (*Id*., PageID.2277).

Defendants assert that jail medical staff "did everything they could under the circumstances and with the information known to them at the time to address Plaintiff's mental health," by documenting Plaintiff's reported mental health history, and, in an abundance of caution, ordering suicide watch. This, they argue, establishes no issue of fact as to whether medical staff recklessly disregarded Plaintiff's mental health conditions. (DN 90-1, PageID.1700-01). They further observe that Plaintiff "failed to cite to any federal, state, or local authority pursuant to which a county jail must provide a mental health professional to treat inmates," and that Plaintiff could have, but did not avail himself of a mental health crisis intervention hotline available to inmates through Communicare. (*Id*., PageID.1701).

In addition to the Defendants' evidentiary submissions, Plaintiff produces a myriad of medical records from GCDC consisting of progress notes, medical requests, and grievances pertaining to his medical treatment, as well as private medical records. (DN 79-1, PageID.912-972). Although there is no record evidence documenting Plaintiff's diagnoses of depression and anxiety aside from his self-reports,[3] the Court will assume them to be ongoing serious medical needs sufficient to satisfy the objective prong of the deliberate indifference standard.[4] The Court

---

[3] There is no evidence or reference to a PTSD or schizophrenia diagnosis in the record.
[4] Defendants appear to do the same as they do not address the objective component in their argument.

15

thus examines whether Plaintiff raises a genuine dispute as to the subjective component of his deliberate indifference claim against Washington and Skaggs.

To prove the subjective prong of deliberate indifference in the context of a pretrial detainee, a plaintiff must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Mercer v. Athens Cnty.*, 72 F.4th 152, 161 (6th Cir. 2023) (internal quotation omitted). Each Defendant must be considered individually. *Id.* ("We consider each defendant individually because we cannot impute knowledge from one defendant to another[.]") (internal quotations and citations omitted). Moreover, where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Neither "mere medical negligence, nor a disagreement between treater and patient as to the better course of treatment, does not equate to a constitutional violation[ ] under . . . the Fourteenth Amendment." *Vontz v. Hotaling*, No. 2:19-CV-12735, 2023 WL 2881350, at *6 (E.D. Mich. Mar. 6, 2023), *report and recommendation adopted*, 2023 WL 2873347 (E.D. Mich. Apr. 10, 2023) (citing *Brawner*, 14 F.4th at 596); *see also Darby v. Greenman*, 14 F.4th 124, 129 (2d Cir. 2021) (holding, after the modification of the second prong of the Fourteenth Amendment's deliberate indifference standard in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), that "a difference of opinion about the proper course of treatment" does not demonstrate deliberate indifference).

The record reflects that in his Medical Questionnaire at booking, Plaintiff reported he had previously taken or been prescribed Effexor for emotional problems. (DN 90-6). At his medical intake with Skaggs, he reported a past suicide attempt but that he "never was treated or seen by a psych Dr. – [no] diagnosis – then he stated he was diagnosed with bipolar, depression,

16

schizophrenia a long time ago. [No] psych meds." (*Id.*) (cleaned up). As a precautionary measure, Plaintiff was placed on suicide watch due to his report of a past attempt. (DN 90-5).

The record shows that from December 15, 2022, through August 24, 2023, Plaintiff saw medical staff several times during his detention at GCDC for a variety of issues, however, the record shows no complaints of mental health concerns until August 10, 2023. (DN 79-1, PageID.914-16).

Plaintiff acknowledged in a June 15, 2023 grievance that he did not mention his mental health concerns during a recent visit with Washington because "the doctor came so early, my thoughts were not all there . . . ." (*Id.*, PageID.943). Skaggs responded to the grievance, advising, "It is standard procedure to review any records of past medical history before treating issues you answered yes to mental health. It is your responsibility to follow up on treatment to turn in a medical request. It is your responsibility to bring up issues with medical provider." (*Id.*).

On August 10, 2023, Plaintiff requested Effexor for depression and anxiety. (*Id.*, PageID.916). At that time, Washington noted that he told Plaintiff that "mental health therapy services are not at this facility. [Plaintiff] states he will contact BOP to be transferred to a facility that has mental health services." (*Id.*). Effexor was ordered for Plaintiff. (*Id.*, PageID.949, 969).

Plaintiff filed several grievances containing general complaints about the lack of available treatment at GCDC (including mental health treatment), copayments, and communication issues. (*Id.*, PageID.932-72). In responding to Plaintiff's grievances about mental health treatment, Skaggs informed Plaintiff that "all mental health issues are seen and treated by the medical provider," "you were seen by [a] medical provider," and "you have been put on mental health meds." (*Id.*, PageID.944, 949, 950). In September and October of 2023, Plaintiff asked to be referred to a mental health specialist. (*Id.*, PageID.950-51, 954, 970-972). Plaintiff was advised,

17

"[i]n order to get treatment or be referred elsewhere you have to see our medical authority. Any outside treatment will be ordered by him and approved by USMS." (*Id.*, PageID.951).

In his supporting memorandum, Plaintiff concedes that he received treatment for his depression at GCDC but complains that he was only prescribed medication and that he should have been prescribed "outside care." (DN 100-2, PageID.2286-87). It is therefore undisputed that Plaintiff received treatment for his mental health issues on the sole occasion that he reported symptoms in August 2023, and that he was prescribed his requested medication a short time thereafter. The record does not support that additional outside treatment was necessary.

The record also does not evince recklessness on Washington and Skaggs's behalf but rather demonstrates Plaintiff's dissatisfaction with not being offered mental health counseling services at GCDC or from an outside provider. This, however, does not present a genuine issue of material fact as to whether Defendants Washington or Skaggs ignored or overlooked a serious medical need. *See Taylor v. Well Path Medical*, No. 3:22-CV-00705, 2024 WL 3897449, at *7 (M.D. Tenn. Aug. 20, 2024) (pretrial detainee's "desire for different, more aggressive, or more prompt treatment is simply not sufficient to support a constitutional claim."). While Plaintiff may disagree with the adequacy of the treatment he received, such disagreement does not rise to a constitutional infirmity. *Id*. ("In the end, Plaintiff's claim . . . is based upon Plaintiff's dissatisfaction with the adequacy of the treatment that he received, which is insufficient to support a constitutional claim."). Plaintiff, by his own admissions, alleges deliberate indifference for not receiving the treatment of his choice.

Based on this record, Plaintiff has failed to raise a genuine dispute as to whether Washington or Skaggs acted either intentionally to ignore a medical need or recklessly failed to act reasonably to mitigate the risk the serious medical need posed. *Wagle v. Farris*, No. 5:21-CV-

18

12881, 2023 WL 5988615, at *6 (E.D. Mich. July 25, 2023) (granting summary judgment where plaintiff disagreed with physician's course of treatment). The being no genuine dispute as to whether Defendant Washington or Defendant Skaggs were deliberately indifferent to Plaintiff's serious medical needs, the Court finds that they are entitled to summary judgment.

*b. Injuries following the June 5 altercation*

Plaintiff also challenges the adequacy of the treatment he received by Carago and Skaggs following his altercation on June 5, 2023. (DN 100-2, PageID.2290, *et seq*.). Specifically, he argues that Skaggs' instruction to leave his loose tooth alone resulted in the loss of the tooth which he contends could "have been saved if properly treated," but he was "never referred to a dentist." (*Id.*, PageID.2281-82).

The progress notes reveal that Plaintiff was brought to the medical unit following the altercation on June 5, 2023, at which time he complained of a cut on his mouth and left knee pain. Carago examined Plaintiff's mouth under his upper and lower lips and observed "no bleeding or swelling evident." (DN 79-1, PageID.914-16). Likewise, his left knee showed no bleeding, bruising, or swelling, and his elbow had full range of motion without difficulty. (*Id.*). Two days later, he returned to medical complaining of a loose tooth and cut mouth from the same altercation. Skaggs noted Plaintiff's upper right lip showed an occlusion requiring no stitches. A loose tooth was observed on the bottom front, and he was advised to "leave it alone." (*Id.*). Plaintiff was extensively examined for jaw, back, elbow, and knee pain, which revealed no swelling, bruising, deformities, or scratches, and he had full range of motion. Plaintiff was prescribed 800mg ibuprofen and Flexeril for pain. (*Id.*).

The legible progress notes from June 15, 2023, show that Plaintiff presented at medical for a follow-up for his altercation injuries. Plaintiff had full range of motion of knees and neck. He

19

was "educated about arthritis exercise injury precautions" and was to be ordered Prednisone and Mobic for pain.  (*Id.*, PageID.916).

There is no dispute, therefore, that Plaintiff was provided medical treatment and care for his injuries following the June 5, 2023, altercation.  As to the objective component of his claim, the record demonstrates that Plaintiff's injuries were not serious medical needs for purposes of the deliberate indifference inquiry, as they required minor or no treatment.  *See, e.g., Burgess v. Fischer*, 735 F.3d 462, 470, 477 (6th Cir. 2013) (bruising, swelling, a small cut, and a broken tooth did not meet objective prong of deliberate indifference inquiry, though a CT scan later revealed jaw and skull fractures requiring surgery); *Hammock v. Rogers*, No. 1:17-CV-1939, 2019 WL 7944420, at *14 (N.D. Ohio Nov. 13, 2019), *supplemented*, 2019 WL 6051546 (N.D. Ohio Nov. 15, 2019), and *report and recommendation adopted*, 2019 WL 6648973 (N.D. Ohio Dec. 6, 2019) (observing that "[s]uperficial physical conditions, such as minor "cuts, bruising, and swelling" that are treated with ibuprofen are not "serious medical needs" requiring medical treatment" and concluding that minor facial cuts, a swollen lip, and a loose tooth were insufficient to meet objective prong of deliberate indifference inquiry).

Even so, because Plaintiff's loose tooth was examined and he was advised to "leave the tooth alone," the seriousness of his dental issue would be properly gauged by examining the effect of delay in seeing a dentist.  *See Santiago v. Ringle*, 734 F.3d 585, 590–91 (6th Cir. 2013) (holding that because the plaintiff had received some treatment for his condition, the plaintiff was required to present medical proof establishing that delay of the desired treatment caused a serious medical injury); *Blosser v. Gilbert*, 422 F. App'x 453, 460–61 (6th Cir. 2011) (plaintiff, who had received pain medication, monitoring, and care but was not referred to a specialist for almost a month was required to present "verifying medical evidence of the detrimental effect of the delay").  And

20

Plaintiff fails to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted), *abrogation on other grounds recognized by Lawler v. Hardiman Cnty., Tenn.*, 93 F.4th 919 (6th Cir. 2024). Despite Plaintiff's production of his institutional and private medical records, there is no evidence of a lost tooth in the record. (DN 79-1, PageID.914-931).

Finally, even if Plaintiff sufficiently raised an issue of fact as to whether his loose tooth was a serious medical need, he cannot show that Skaggs recklessly disregarded this condition as required for the subjective component of his claim. At most, the record raises the inference of negligence by Skaggs, which cannot defeat Defendants' motion for summary judgment. *See Helphenstine*, 60 F.4th at 316. Carago and Skaggs are entitled to summary judgment on this claim.

### c. Cervical spine condition

With respect to Plaintiff's claim of chronic neck pain, he states that he had previously been prescribed physical therapy but was only offered prescription medication for pain by Defendant Washington. (DN 100-2, PageID.2276-77, 2286-87).

The record confirms Plaintiff's history of cervical stenosis. His private medical records indicate that he was treated for this condition from 2017 to 2021, during which time it was "managed conservatively," including physical therapy. (DN 79-1, PageID.924-25, 929).

In a December 16, 2022, requisition form, Plaintiff stated that he had "injuries to my neck, shoulder and knees. The mattress is so thin it feels like I'm sleeping on the metal bunk . . . . I'm in constant pain." (*Id.*, PageID.932). Plaintiff was advised to "put in a request to medical to go to

21

doctor call for your neck." (*Id.*).  However, none of the medical requests filed by Plaintiff since his arrival at GCDC requested treatment for his neck condition.

For example, a December 22, 2022, request inquired, "Who's the medical provider here? The company name?" (*Id.*, PageID.960).  Multiple requests from February 9 through February 20, 2023, pertain only to obtaining bandages.  (*Id.*, PageID.955-59, 961-62).  A February 25, 2023, request appears to dispute the charges of a copay.  (*Id.*, PageID.963).  On June 5, 2023, Plaintiff wrote that he was seen by medical after the altercation but was "denied any treatment or care." Plaintiff was referred to review "notes."  (*Id.*, PageID.964).  On June 15, 2023, Plaintiff wrote, "the medical provider saw me today but didn't have my records.  He said he will go over them when he gets them and call me back down.  Will I have to pay for that visit too?"  (*Id.*, PageID.967). Finally, a request dated July 11, 2023, asked "has my medical records been received yet?" to which staff responded, "Yes medical provider reviewed no new orders do you want to be seen [?]" (*Id.*, PageID.968).

The progress notes from GCDC also establish that Plaintiff's medical records were reviewed and that he received treatment for his cervical spine condition when he sought it.  On June 15, 2023, during a follow-up for his altercation injuries, Plaintiff exhibited full range of motion of knees and neck as noted by Washington.  Plaintiff was "educated about arthritis exercise injury precautions" and was to be ordered Prednisone and Mobic for pain.  (*Id.*, PageID.916).

Progress notes by Washington dated June 29, 2023 indicate that Plaintiff's "medical records reviewed for chronic neck pain . . . confirms degenerative changes at C4-C5.  Pt has been prescribed Mobic will continue current treatment."  (*Id.*, PageID.915).  On August 10, 2023, Washington observed, "During the appt Pt. constantly made references to services not available at GCDC and his requests to see neurosurgical services."  He further noted that Plaintiff was able to

22

get on and off the examination table without assistance and had steady gait.  Washington advised Plaintiff to continue conservative therapy.  (*Id.*, PageID.916).

Plaintiff's deliberate indifference claim pertaining to his cervical spine condition asserts that: (1) Washington did not seek "outside care" or "alternative sources of treatments" for Plaintiff's neck; and (2) Washington was negligent in failing to obtain Plaintiff's medical records for six months, causing him "ongoing chronic pain, discomfort, and deterioration."  (DN 100-2, PageID.2282, 2287).

The record does not support Plaintiff's claim that his cervical spine condition was an objectively serious medical need insofar as he did not seek treatment or a medical visit for this condition, despite numerous requests.  (DN 79-1, PageID.915).  "Plaintiff's failure to pursue further care undermines any allegation of serious medical need or deliberate indifference." *Nevels v. Ellenwood*, No. 1:18-CV-12142, 2019 WL 316532, at *4 (E.D. Mich. Jan. 24, 2019) (citing *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) ("if anyone was indifferent to Pinkston's injuries, it was Pinkston himself . . . [Because he] did not submit a medical attention request form until [four days after his injury,] even Pinkston did not consider his injuries serious enough that they rose" to a serious medical need) and *Brown v. Coffee Cnty., Tenn.*, No. 4:08-CV-93, 2009 WL 5205367, at *11 (E.D. Tenn. Dec. 23, 2009) ("Plaintiff Bell's failure to seek additional treatment . . . when his finger was getting progressively worse, does not provide a basis upon which the Court may find that Defendants acted with a culpable state of mind as to his injuries" because he "knew the procedure for requesting medical treatment[.]").

Further, as Defendants point out (DN 90-1, PageID.1705), Plaintiff produces no evidence that his cervical spine, or any medical condition, worsened as a result of the alleged inadequacies by Washington, including any failure in timely obtaining Plaintiff's medical records.  *See Hodges*

23

*v. Abram*, 138 F.4th 980, 990 (6th Cir. 2025) (pretrial detainee must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment" to satisfy objective prong where injury or illness was not "obvious") (internal quotation omitted); *see also Malone v. Anderson*, No. 2:15-CV-76-RLJ-DHI, 2015 WL 1867615, at *3 (E.D. Tenn. Apr. 23, 2015) ("Plaintiff does not set forth any facts tending to show an urgent need for surgery, nor does he set forth any facts tending to show that the alleged delay in receiving his medical records and/or scheduling surgery, to the extent surgery is necessary, constitutes an act of deliberate indifference which has at all injured plaintiff."); *Cole v. S. Health Partners*, No. 717CV00113KKCEBA, 2018 WL 7134023, at *5 (E.D. Ky. Sept. 7, 2018), *report and recommendation adopted sub nom. Cole v. S. Health Partners, Inc.*, 2019 WL 333556 (E.D. Ky. Jan. 25, 2019) (without evidence of a detrimental effect, plaintiff failed to establish that medical staff's delay in obtaining his medical records constituted deliberate indifference.); *Cohen v. Mohr*, No. 2:15-CV-431, 2016 WL 5387694, at *4 (S.D. Ohio Sept. 27, 2016) (granting summary judgment where there was "no evidence that defendants would have treated plaintiff any differently if they had received his medical records sooner," that his claim was "simply a restatement of plaintiff's disagreement with the medications which were provided.").

Finally, Plaintiff's claim that he desired alternative therapies, outside treatment, and physical therapy do not fall within the scope of a constitutional violation for deliberate indifference. *See Helphenstine*, 60 F.4th at 322 (observing that, generally, a pretrial detainee's disagreement with physician's course of treatment alleges, at most, medical malpractice and is not cognizable under § 1983); *Taylor*, 2024 WL 3897449, at *8 (pretrial detainee's "desire for different, more aggressive, or more prompt treatment is simply not sufficient to support a constitutional claim."); *Wagle,* 2023 WL 5988615, at *6 (granting summary judgment where

24

plaintiff disagreed with physician's course of treatment). While Plaintiff may disagree with the adequacy of the treatment he received, such disagreement does not rise to a constitutional infirmity. *Taylor*, 2024 WL 3897449, at \*8 ("In the end, Plaintiff's claim . . . is based upon Plaintiff's dissatisfaction with the adequacy of the treatment that he received, which is insufficient to support a constitutional claim.").

In summary, Plaintiff has failed to raise a genuine dispute as to whether Defendants Carago, Skaggs, and Washington were deliberately indifferent to his serious medical needs, and summary judgment on these claims is warranted.

### 3. Fourteenth Amendment—Failure to Protect

. "The Supreme Court has established that 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Westmoreland v. Butler Cnty., Ky.,* 29 F.4th 721, 726 (6th Cir. 2022) (quoting *Farmer*, 511 U.S. at 833). Courts employ a four-part test in analyzing failure to protect claims under the Fourteenth Amendment. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022).

> Under that test, an officer violates the Fourteenth Amendment when (1) he acts intentionally "with respect to the conditions under which the plaintiff was confined," (2) those conditions "put the plaintiff at substantial risk" of harm, (3) he does not take reasonable steps to abate that risk, and (4) by failing to do so he actually causes the plaintiff's injuries."

*Id.* (quoting *Westmoreland*, 29 F.4th at 729).

Plaintiff alleges that Defendants Oldham and Pinkert were deliberately indifferent to his safety when they moved him to Cell 161 in general population on June 1, 2023, where he was assaulted by other inmates a few days later. Specifically, he states that Oldham disregarded the safety threats that Plaintiff previously reported and moved him from administrative segregation to general population against his protests. (DN 100-2, PageID.2299-2303). During a temporary

25

transfer on June 2, 2023, Plaintiff alleges that Pinkert "heard and witnessed another inmate in the unit threaten Plaintiff with bodily harm while doing nothing to intervene." (*Id.*, PageID.2301).

Defendants argue that Plaintiff has produced no evidence to support his claim that Oldham and Pinkert failed to protect him. (DN 90-1, PageID.1707-08).

Plaintiff was held in some form of segregation from December 2022 until June 1, 2023, when he was moved to Cell 161 "from seg due to needing cell." (DN 90-10). Oldham explains in his affidavit that the cell was needed for a "more problematic inmate. There were no other administrative segregation cells available." (DN 90-9). In following GCDC policy, "Plaintiff had to be moved into a 'max' general population cell, which are small cells that house non-violent inmates and are thus the next safest option." (*Id.*).

The same day, Plaintiff wrote a grievance, reporting that he did not "feel safe," was "uncomfortable" leaving his cell, that his cell door did not lock, and there were no cameras present. The response stated, "We put you in a max unit [be]cause its small and can only have 8 people in it. This is where you will stay until you can tell us exactly why you are scared & who of[;] stating gangs is not a reason." (DN 79-2, PageID.1001). Oldham attests that "GCDC is a county jail with limited space to move inmates at every request. There must be a rational reason or legitimate, verifiable threat." (DN 90-9).

Nonetheless, Plaintiff was temporarily relocated on June 2, 2023, for "safety and security" reasons. (DN 79-2, PageID.1019). Oldham attests that on that date he investigated Plaintiff's complaint and confirmed there was not an active threat to his safety in Cell 161. Plaintiff was consequently returned Cell 161 on June 3, 2023. (DN 90-9). Plaintiff did not make any further reports concerning his safety until after the assault occurred. (*Id.*).

26

The record establishes that Oldham acted intentionally to move Plaintiff into Cell 161 due to needing the administrative segregation cell for another inmate.  However, as discussed below, Plaintiff proffers no admissible evidence sufficient to raise genuine issues of fact as to whether he was placed at a substantial risk of harm in Cell 161 and whether Oldham took reasonable steps to abate the risk.

Plaintiff argues that he "immediately submitted a grievance in which Defendant Bobby Oldham recklessly disregarded the Plaintiff's perceived threat."  (DN 100-2, PageID.2300). However, his report that he "fear[ed] someone would harm him," did not "feel safe" in his cell, and had been threatened "months ago" is insufficient to establish a serious risk.  (DN 79-2, PageID.1001).  *See Chappell v. Woods*, No. 19-3355, 2020 WL 6162996, at \*4 (6th Cir. June 8, 2020) (complaints expressing "only a generalized fear about returning to general population" did not create a genuine issue of material fact as to prisoner's failure to protect claim); *Gant v. Campbell*, 4 F. App'x 254 (6th Cir. 2001) ("[a]lthough Gant expressed a general concern, he had not received any threats prior to being transferred, nor did he identify any particular gang members whom he feared."); *see also Chappell v. Woods*, No. 1:17-CV-00080, 2019 WL 1305859, at \*3 (S.D. Ohio Mar. 22, 2019), *aff'd*, No. 19-3355, 2020 WL 6162996 (6th Cir. June 8, 2020) (explaining that "[t]he passage of time and an inmate's actions can eliminate proof of causation in a failure to protect claim[,]" and finding the five-month lapse of time between threats and altercation undermined inmate's claim).

Plaintiff also seeks to create a genuine dispute by asserting that "the 'max' unit is the most, if not the most, disruptive and house the jail's most violent inmates and rule breakers."  (DN 100-2, PageID.2301).  However, he provides no facts and cites to no evidence to support his conclusion, and it is well-settled that "conclusory assertions, unsupported by specific facts made in affidavits

27

opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." *Rachells v. Cingular Wireless Emp. Servs., LLC*, No. 1:08 CV 02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting *Thomas v. Christ Hosp. and Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003)); *see also, e.g., Sheffield v. Int'l Paper Co.*, 443 F. Supp. 3d 937, 943 (W.D. Tenn. 2020) ("Statements contained in an affidavit that are 'nothing more than rumors, conclusory allegations and subjective beliefs' are insufficient" to withstand summary judgment) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992)).

Additionally, it appears that Plaintiff seeks to rebut the evidence of Oldham's measures taken to mitigate the potential threats to Plaintiff's safety before returning him to Cell 161 by asserting that Oldham "fabricat[ed] the record to appear as if precautions were taken to address the Plaintiff's safety concerns." (DN 100-2, PageID.2300). Plaintiff again sets forth no specific facts in support of his accusation and as such, it cannot serve to create a factual dispute. *See Weatherspoon v. Lnu*, No. 14-CV-12789, 2017 WL 928110, at *5 (E.D. Mich. Mar. 9, 2017), *aff'd sub nom. Weatherspoon v. George*, No. 17-1371, 2018 WL 11591215 (6th Cir. Nov. 8, 2018) (claims of "falsified" records did not preclude summary judgment where plaintiff's affidavits contained only conclusory statements).

As to Pinkert's purported knowledge of threats against Plaintiff, Plaintiff does not explain the basis for his knowledge that Pinkert witnessed or overheard another unidentified inmate threaten Plaintiff with bodily harm. He therefore cannot rely on this assertion to create a genuine dispute that Pinkert was aware of a specific threat to his safety. *See Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 420 (6th Cir. 2020) (summary judgment affidavits cannot rely on inadmissible hearsay).

For these reasons, Plaintiff fails to raise a genuine dispute as to whether Defendants Oldham and Pinkert were deliberately indifferent to his safety and failed to protect him. They are entitled to summary judgment on this claim.

### 4. Fourteenth Amendment—Procedural Due Process

"[P]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).[5] An inmate's due process rights in connection with a disciplinary hearing are satisfied, therefore, when he receives "notice of the charges, an opportunity to present evidence, and a written decision explaining the finding of guilt." *Tate v. Quintana*, No. 18-6179, 2019 WL 5866596, at *1 (6th Cir. May 22, 2019) (citing *Wolff*, 418 U.S. at 563–66).

Plaintiff claims that Henderson, Oldham, Pinkert, and Gary violated his right to procedural due process by placing him in administrative disciplinary segregation without notice of the charges against him and without a hearing. (DN 100-2, PageID.2307-08)

The record establishes that Pinkert issued a Notice of Administrative Charges on June 2, 2023, charging Plaintiff with (1) "Profanity, derogatory remarks or gestures to any member of the staff, visitors, or fellow inmates," (2) "Disrupting religious, medical or food services or any other facility program;" and (3) "Interfering with security operations of the facility." The notation "refused to sign" appears on the notice. (DN 79-2, PageID.1034). In a grievance dated June 7,

---

[5] Defendants cite to *Sandin v. Conner*, 515 U.S. 472, 484 (1995) for the proposition that a prison disciplinary proceeding does not give rise to a protected liberty interest unless the restrictions imposed constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (DN 90-1, PageID.1710-11). While there "[t]here is some question as to whether *Sandin* provides the proper measure for changes in the conditions of confinement for pretrial detainees[,]" *Lyons v. Barry Cnty. Jail*, No. 1:24-CV-1162, 2025 WL 262142, at *8 (W.D. Mich. Jan. 22, 2025); *see also Johnson v. Grayson Cnty., Ky. Det. Ctr.*, No. 21-5772, 2022 WL 3479501, at *2 (6th Cir. May 27, 2022) (acknowledging the absence of Sixth Circuit precedent deciding whether *Sandin*'s atypical and significant hardship standard governs procedural due process claims brought by pretrial detainees), the Court need not resolve that inquiry here. It presumes, for purposes of this motion only, the existence of a liberty interest sufficient to trigger the due process protections of *Wolff*.

2023, Plaintiff wrote, "I was read the charges against me on 6-2-23 . . . . I was never read the [incident] report written against me, had a hearing or anything." Plaintiff stated the charges were based on a "clear misunderstanding with Nurse Christina," and amounted to a "minor" incident warranting only a "warning." Henderson responded, "You were advised of the admin charges within P&P. This will not change." (*Id*., PageID.1036). Plaintiff concedes, in his opposition to Defendants' motion, that Pinkert "served" him with the notice on June 2, 2023, "which he refused to sign." (DN 100-2, PageID.2307).

Based on the record, no issue of fact remains as to whether Plaintiff received notice of the disciplinary action against him. *See Johnson v. Thorpe*, No. 4:20-CV-00149-JHM, 2021 WL 5435426, at *4 (W.D. Ky. Nov. 19, 2021) (granting summary judgment on inmate's claim that he did not receive proper notice of the disciplinary action against him and did not receive a hearing where the record showed that he was given a Notice of Administrative Charges but he refused to sign it; the notice "operated to give "Plaintiff" notice of the Disciplinary Board's hearing on the matter, which led to the sanctions being issued against him."). Defendants Henderson, Oldham, Pinkert, and Gary are entitled to summary judgment on this claim.

### 5. First Amendment/RLUIPA—Religious Diet

"Prisoners retain the First Amendment right to the free exercise of their religion." *Hayes v. Tenn*., 424 F. App'x 546, 549 (6th Cir. 2011) (citing *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985)). A violation of the First Amendment requires the imposition of a "substantial burden" on a plaintiff's exercise of his religion. *Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015). Similarly, RLUIPA prohibits the governmental imposition of a "substantial burden on the religious exercise" of an inmate unless the government establishes that the burden

30

furthers a "compelling governmental interest" through the "least restrictive means[.]"  42 U.S.C. § 2000cc-1(a).

Plaintiff alleges that Grayson County and Defendant Meredith denied his participation in the kosher meal program from December 15, 2022 through January 15, 2023.  (DN 100-2, PageID.2318-19).  Plaintiff states that he "requested commissary items that he was unaware were non-kosher/haram because the commissary items are not labelled to identify kosher/dietary items." (*Id.*, PageID.2318).  Consequently, Plaintiff's kosher meal plan was cancelled.  Plaintiff filed multiple grievances and requisition forms requesting a list of kosher-compliant items or for kosher items to be labeled as such, which were denied by Meredith.  (DN 79-3, PageID.1082-89).

### *a. RLUIPA*

Defendants argue that Plaintiff cannot maintain his RLUIPA claim for monetary damages against them.  (DN 91-1, PageID.1711).  The Court agrees.  First, the Sixth Circuit has made clear that "RLUIPA does not authorize damages against officials sued in their official capacity . . . or in their individual capacity."  *Ali v. Adamson*, 132 F.4th 924, 930 (6th Cir. 2025) (citing *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), and *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014)); *see also Eidam v. Cnty. of Berrien*, No. 1:19-CV-978, 2019 WL 7343354, at *8 (W.D. Mich. Dec. 31, 2019) ("a money-damages action cannot be sustained against counties or municipalities."); *Gellani v. Oakland Cnty.,* No. 24-CV-10353, 2025 WL 310116, at *3 (E.D. Mich. Jan. 27, 2025) (finding that a plaintiff "may not recover money damages under RLUIPA."); *Ormond v. Harm*, No. 6:23-CV-00176-GFVT, 2024 WL 3432220, at *2 (E.D. Ky. July 15, 2024) ("With respect to his request for monetary damages, it has long been held that the RLUIPA does not permit claims for money damages against prison officials sued in their individual capacities; rather, it permits a plaintiff to seek only injunctive and declaratory relief against the officers in their official capacities

31

(that is, against the state, county, or city government that employs them).").  Further, his request for injunctive and/or declaratory relief is rendered moot by his transfer to another facility. (DN 105, [notifying the Court of his transfer to USP Canaan]).  *See Ormond*, 2024 WL 3432220, at *2 ("an inmate's claim for declaratory or injunctive relief becomes moot when he is transferred away from the institution where the underlying complaint arose.") (citing *Heyward v. Cooper*, 88 F.4th 648, 656–57 (6th Cir. 2023), *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010), and *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)).

Accordingly, summary judgment in favor of Grayson County and Meredith is appropriate on Plaintiff's RLUIPA claim.  *See Pleasant-Bey v. Shelby Cnty.*, No. 18-6063, 2019 WL 11769343, at *3 (6th Cir. Nov. 7, 2019) ("[RLUIPA]" simply does not permit claims for monetary damages . . . . And [Plaintiff's] request for injunctive relief became moot once he was transferred from the Jail.") (citations omitted).

### *b. Free Exercise*

Evaluating Plaintiff's claim under the First Amendment free exercise standard, the Court must make an initial determination as to: (1) whether Plaintiff's belief or practice asserted is religious in his own scheme of things, (2) whether his belief is sincerely held, and (3) whether the challenged action of the prison officials infringes on his religious belief or practice.  *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987) (internal citations and quotations omitted).  The Court assumes, for purposes of this motion only, that Plaintiff has established these threshold factors.

However, "[a]n inmate's right to freely exercise his religion may be subject to reasonable restrictions while he is incarcerated . . . .  Thus, [a] prison policy of not providing [an inmate's] kosher meals may be permissible if it is reasonably related to a legitimate penological interest.

32

*Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003) (citations omitted). In analyzing whether an infringement is reasonably related to a legitimate penological interest, a reviewing court considers four factors:

> "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." [*Turner v. Safley*, 482 U.S. 78, 89 (1987)]. If not, the regulation is unconstitutional, and the other factors do not matter. *Id*. at 89–90. Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests."

*Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (quoting *Turner*, 482 U.S. at 90–91).

The Sixth Circuit has examined an inmate's removal from a religious meal program for having purchased non-kosher items from the prison commissary, finding that "[p]rison officials have a legitimate penological interest not only in controlling the cost of the kosher meal program and ensuring that only those with sincere beliefs participate in the program, but also in maintaining discipline within the prison. *Berryman v. Granholm*, 343 F. App'x 1, 6 (6th Cir. 2009) (citing *Russell*, 79 F. App'x at 177).

Plaintiff does not address the *Turner* factors and makes no argument beyond his assertion that Defendants should have labeled or otherwise identified kosher-compliant items on the jail's commissary order form.[6] (DN 100-2, PageID.2318-19). As in *Berryman*, the remaining *Turner* factors weigh in favor of Defendants. Plaintiff may purchase kosher food from the jail commissary and can reapply for the kosher meal program. *See e.g., Nixson v. Davis*, No. 2:18-CV-1720, 2020

---

[6] Plaintiff does not allege or suggest that the food/items sold by the commissary lack a listing of ingredients, which an observant inmate may use to identify religious diet-compliant items. While his grievances suggest Plaintiff was "new" to the kosher diet (DN 79-3, PageID.1088), he does not allege that he inquired as to the kosher status of the items he sought to purchase before placing his order.

WL 1929363, at *6 (S.D. Ohio Apr. 21, 2020); *O'Connor v. Leach*, No. 1:18-CV-977, 2020 WL 838084, at *4 (W.D. Mich. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 2187814 (W.D. Mich. May 6, 2020). Additionally, "courts have recognized that expanding access to kosher meals can create and security- and cost-related impacts on guards, inmates, and prison resources." *Santos v. Chambers-Smith*, No. 2:19-CV-2984, 2020 WL 4434866, at *5 (S.D. Ohio Aug. 3, 2020). Finally, Plaintiff has not proffered any alternatives at a *de minimis* cost to the jail. *Berryman*, 343 F. App'x at 6.

Defendants Grayson County and Meredith are entitled to summary judgment as to Plaintiff's First Amendment free exercise claim against them.

### 6. First Amendment—Free Speech and Association

#### a. Publications

"The First Amendment protects 'the right to receive information and ideas,' which, as applicable in the prison context, extends to the right to receive mail and to access reading material." *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *see also Parrish v. Johnson*, 800 F.2d 600, 603 (6th Cir. 1986) (noting that "prisoners have some First Amendment rights in receiving mail"); *Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) (describing publishers' "legitimate First Amendment interest in access to prisoners" in the context of analyzing a prisoner's right to receive publications). The factors set forth in *Turner*, 482 U.S. at 84, are applicable to First Amendment claims pertaining to limitations on inmate publications. *Bethel*, 988 F.3d at 939.

Plaintiff's second amended complaint alleges a First Amendment violation on the basis that "Defendant Deputy Sara [Board] allows books to be sent in within an inmate's first fourteen (14) days of arriving at GCDC. After fourteen days, all books must be donated to GCDC before

34

an inmate can request access to it." (DN 23-1, PageID.503).  He states that this practice "places substantial burdens on the Plaintiff and other inmates obtaining reading materials of their choosing or purpose."  (*Id*.).

Defendants aver that GCDC's general policy limiting publications is reasonably related to penological interests under the *Turner* factors.  (DN 90-1, PageID.1713).  Jailer Woosley attests:

> Allowing inmates unfettered access to publications would make the facility less safe by increasing the workload of deputy jailers and providing material that would be used to create fires, clog plumbing, or conceal contraband.  Requiring deputy jailers to check every publication for contraband, sort it, deliver it, and dispose of it would detract from their ability to perform normal duties maintaining safety and security of the facility.

(DN 90-2).

> Plaintiff, in his responding memorandum states,

> While housed at the GCDC, the Defendants had a custom and/or practice allowing inmates to have books ordered and sent into the facility, with a limit of (5) that must be donated to the facility.  In conjunction the donator will have first access to the donated books.  The Defendants use legal books ordered by inmates to sale copies to other inmates . . . . [T]hese customs and practices of making inmates donate their books to the facility, goes against GCDC policy that allows inmates to have books . . . . The GCDC officials changed their book/publication policy, by forcing inmates to donate books their family or they themselves order and the GCDC officials use these books (legal) to give inmates copies and for their own financial gain.

(DN 100-2, PageID.2312; *see also* DN 100-1, PageID.2256 ["Books, publications etc. are denied unless it's a monetary gain for GCDC."]).

Plaintiff cites to the GCDC Inmate Rules and Handbook which states that "[a]ll property will be accepted through the mail or bonding window for a period of 14 days after confinement at this facility.  Beyond the 14 days these items will be purchased from the commissary." (DN 79-2, PageID.978).  Permissible property includes, *inter alia*, two paperback books.  (*Id*., *see also* DN 79-3, PageID.1042).  He also points to a receipt showing a payment for photocopies.  (DN 79-4, PageID.1150).

Plaintiff again appears to be broadening the scope of his claim to encompass a policy or custom pertaining to legal publications or reference material. However, he cannot advance new claims or theories at this stage of the litigation. *See Davis*, 945 F.3d 483, 496; *Desparois*, 455 F. App'x at 666; *Stoutamire*, 2022 WL 263021, at *6.

To the extent that he challenges GCDC's practice of requiring inmates to donate their books received in the mail, he submits no evidence to support his allegation. Moreover, his argument that this practice violated an internal policy of the jail does not amount to a constitutional violation. *See, e.g.*, *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Lopez v. Hart Cnty., Ky.*, No. 116CV00056GNSHBB, 2018 WL 4689472, at *7 (W.D. Ky. Sept. 28, 2018) ("the failure to adhere to jail policies does not necessarily equate to a constitutional violation."); *see also Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir. 1985) ("The mere failure to comply with a state regulation is not a constitutional violation.").

Defendants' assertion of a valid, rational connection between the GCDC policy and the legitimate penological interest of safety and security is unrefuted. Here, as in *Bethel*, Plaintiff does not dispute that he had an alternative means of acquiring books or the potential burden on corrections staff having to screen every publication for contraband. Moreover, he does not set forth a readily-available alternative. *See Bethel*, 988 F.3d at 941. Insofar as Plaintiff does not address the *Turner* factors, does not controvert Woosley's purported rationale, and presents no evidence to support his unsworn assertions, he fails to raise a genuine dispute for trial. Summary judgment is therefore warranted in favor of Defendants Grayson County and Board on the First Amendment publications claim.

36

*b. Visitation*

The Supreme Court has explained that "[t]he very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Freedom of association under the First Amendment "is among the rights least compatible with incarceration." *Id.* Limitations on visitation may be imposed by prison officials so long as they "bear a rational relation to legitimate penological interests." *Id.* at 132. Reviewing courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.*

Plaintiff alleges that for "disciplinary reasons, visitation is only fifteen (15) minutes[,]" and that he and other inmates "are denied visitation due to such restrictions and substantial burdens . . . denying free association." (DN 23-1, PageID.498).

The policy as provided in the Inmate Rules and Handbook states: "[i]nmates are allowed at least one visit per week . . . . Each visit will be a minimum of fifteen (15) minutes." (DN 79-2, PageID.981).

Despite his voluminous submissions, Plaintiff alleges no facts to show that his visitation was restricted beyond the stated policy. While he may desire longer or more frequent visitation, this does not state a constitutional violation. *See Norris v. Schauman*, No. CIV. 3:13-0542, 2014 WL 3845165, at *5 (M.D. Tenn. Aug. 5, 2014) (dismissing First Amendment claim where Plaintiff alleged that his visitors had a three-hour commute to facility but failed to allege a "prison policy restricting his visitation rights"); *Middlebrook v. Perttu*, No. 2:23-CV-215, 2023 WL 8230376, at *4 (W.D. Mich. Nov. 28, 2023) (dismissing First Amendment association claim based

37

on limitations on telephone use where Plaintiff's allegations suggested that "other methods of communication (i.e., mail or visits) are not his or his family's preferred methods of communication, not that he or his family are prevented from using these forms of communication by the prison.").

To the extent that Plaintiff challenges the constitutionality of GCDC's policy of providing at least once weekly visitation of at least 15 minutes as written, this argument likewise fails. *See Stapleton v. Patton*, No. CIV.A. 07-CV-99-HRW, 2007 WL 3124713, at *3 (E.D. Ky. Oct. 24, 2007) ("a prisoner's right to visitation with family members, like so many other conditions of confinement, is not absolute or unfettered."); *Everheart v. Bryane*, No. 1:17-CV-351, 2018 WL 475005, at *3 (E.D. Tenn. Jan. 18, 2018) ("any First Amendment right to visits that prisoners retain while incarcerated does not require that such visitation may be had on demand, but rather 'must be subject to reasonable restrictions on time, place[,] and manner of visits.'") (quoting *Mills v. Fischer*, 497 F. App'x 114, 116 (2d Cir. 2012)); *Chaffins v. Lindamood*, No. 1:17-CV-00061, 2017 WL 3130558, at *4 (M.D. Tenn. July 24, 2017) (plaintiff's allegation of one family visit per month did not "unreasonably restrict or impair the Plaintiff's constitutional right to communicate with family and friends."). Summary judgment is warranted in favor of Defendant Grayson County on this claim.[7]

### 8. Official Capacity/Municipal Liability Claims

"Without an underlying constitutional violation . . . there can be no municipal liability under *Monell* . . . ." *Boerste v. Ellis Towing, LLC*, 607 F. Supp. 3d 721, 745 (W.D. Ky. 2022). Thus, the claims discussed above that are asserted against Grayson County on a theory of municipal liability cannot survive summary judgment because Plaintiff has failed to establish any

---

[7] Because all of Plaintiff's claims fail as a matter of law, the Court need not address the Defendants' argument that they are individually entitled to qualified immunity.

38

constitutional violation under the First and Fourteenth Amendments. *See Est. of Marr by & through Marr v. City of Glasgow*, No. 1:21-CV-00050-GNS-HBB, 2025 WL 359325, at *8 (W.D. Ky. Jan. 31, 2025), *reconsideration denied*, 2025 WL 1787427 (W.D. Ky. June 27, 2025) ("As outlined above, Plaintiffs have failed to prove a constitutional violation by the Officers. Accordingly, Plaintiffs' *Monell* claim fails as a matter of law, and the City is entitled to summary judgment on this claim.").

### 9. State Law Claims

Having disposed of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over his remaining state law claims of negligence. *See* 28 U.S.C. § 1367(c)(3); *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. May 19, 2011).

### IV. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (DN 90) is **GRANTED**.

As the claims against Defendants Jason Woosley and Kim Stevenson were previously dismissed by the Court's order at DN 18, the Clerk of Court is **DIRECTED** to terminate them as parties to this action.

Date:   March 19, 2026

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of record
4414.015

39